Tracy A. Miller, SBN 015920
Douglas (Trey) Lynn, SBN 028054
OGLETREE, DEAKINS, NASH, SMOAK
& STEWART, P.C.
2415 East Camelback Road. Suite 800
Phoenix, AZ 85016
Telephone:  602.778.3700
Facsimile:  602.778.3750
tracy.miller@ogletree.com
trey.lynn@ogletree.com
*Attorneys for Defendant Matrix Absence
Management Inc.*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Tina Weeks, Michael McDonald, and Cassandra Magdaleno,<br><br>Plaintiffs,<br><br>v.<br><br>Matrix Absence Management Inc.,<br><br>Defendant. | No. 2:20-CV-00884-SPL<br><br>**DEFENDANT MATRIX ABSENCE MANAGEMENT INC.'S MOTION FOR DECERTIFICATION OF COLLECTIVE ACTION** |

Defendant Matrix Absence Management Inc. ("Matrix") moves this court for decertification of the collective action conditionally certified by the Court on October 15, 2020. This motion is supported by the following Memorandum of Points and Authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

Decertification is appropriate because, even accepting Plaintiffs' testimony as true, Plaintiffs had significantly different job duties from one another, making collective treatment of this case not only infeasible, but virtually impossible. The key issue in this action is whether employees who worked for Matrix in four different job categories across three different levels of seniority were properly classified as exempt under the Fair Labor Standards Act ("FLSA"). During their employment as various types of claims examiners

with Matrix, Plaintiffs were classified as exempt under the FLSA as administrative employees. To determine whether Plaintiffs were properly classified as exempt requires an examination into the job duties that each Plaintiff *actually performed*. However, as explained below, the Plaintiffs' job duties varied based on a variety of factors including their seniority (i.e. Level I, II, or Senior), the types of claims they handled (e.g., Long Term Disability or Absence Management Specialist), the clients they worked for and the rigidity of the policy at issue, and their supervisor. Based on these factors, each individual claims examiner's job duties varied significantly and each was vested with a different level of authority to exercise discretion and independent judgment. Thus, Plaintiffs are not similarly situated for purposes of evaluating the exempt status. Instead, resolution of Plaintiffs' claims will require a highly individualized fact intensive analysis at both the summary judgment stage as well as trial. Requiring the Court and jury to conduct 172 mini-trials, one for each Plaintiff, circumvents the purpose of a collective action and, therefore, decertification is appropriate.

## I.      Relevant Procedural History

Plaintiffs Tina Weeks, Michael McDonald, and Cassandra Magdaleno filed this lawsuit on behalf of themselves and other allegedly similarly situated claims examination employees. (ECF No. 1). Plaintiffs claim that they and other putative class members were misclassified as exempt under the FLSA and were not paid overtime for hours worked in excess of 40-hours in a given work week. Plaintiff moved for conditional certification on September 3, 2020. (ECF No. 25). The Court granted Plaintiff's Motion for Conditional Certification on October 15, 2020 and certified a collective composed of "all individuals employed by Defendant as Claims Examination Employees in the last three years who were paid on a salary basis and classified by Defendant as exempt from overtime compensation." (ECF No. 36).

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
ESPLANADE CENTER III, SUITE 800
2415 EAST CAMELBACK ROAD
PHOENIX, AZ 85016
TELEPHONE: 602-778-3700

## II.      FACTUAL BACKGROUND[1]

Matrix adjudicates and manages requests for leaves of absence under state and federal laws and employer policies and disability claims under their clients' self-insured short and long-term disability plans and policies. Matrix also adjudicates claims for disability benefits based on client policies or policies issued by its sister company, Reliance Standard Life Insurance Company.

Because the claims handling process of the various types of claims differ significantly, Matrix organizes its claims examiners into four general categories—Leave of Absence (LOA) examiners, Short Term Disability (STD) examiners, Long Term Disability (LTD) examiners, and Absence Management Specialist (AMS) examiners. LOA examiners, for example, manage leave of absence requests under the Family Medical Leave Act (FMLA) and applicable state law(s). As a result, LOA examiners must know and be able to apply federal and state leave requirements to adjudicate requests for leave of absence. They must also be familiar with each client-employer's leave of absence policies. Adjudicating leave of absence claims requires the examiner to, among other things, interview the claimant-employee, analyze medical documentation, consult with experts to assess claimant's condition, consider whether the medical documentation shows "serious health condition" under the applicable law, and ultimately determine whether to approve the claim.

By contrast, LTD examiners deal with an entirely different set of issues, as client-employers' policies, ERISA regulations, Social Security Disability regulations and/or state disability laws all come into play. Because LTD examiners deal with different issues than LOA examiners, their duties differ as well. LTD examiners must assess the alleged disability's impact on job performance, consider medical treatments, conduct pre-existing condition reviews, determine the claimant's work capacity (if any), evaluate potential return-to-work opportunities, consult with internal and external medical resources to

---

[1] *See* Exhibit 1, Declaration of Rachel Ronfeldt.

understand the medical issues at play, and—ultimately— grant or deny the claim. LTD examiners have the authority to approve LTD payments within their monetary authority.

As Matrix examiners gain more experience and proficiency, they have the opportunity to be promoted from a Level I examiner, to a Level II examiner, and then a Senior examiner. Job duties for each type of examiner (i.e., LOA, STD, LTD, AMS) and category of examiner (Level I, II, Senior) vary. Adjudicating claims requires familiarity with and understanding of federal and state laws, the ability to interpret contractual language, the skills to apply various legal standards or disability and other leave policies to varying fact patterns, and clinical knowledge. Given their duties and discretion to independently adjudicate claims, Matrix classifies these claims examiners as exempt.

## III.   LEGAL STANDARD

The FLSA allows Plaintiffs to sue on behalf of themselves and other "similarly situated" employees. 29 U.S.C. § 216(b). To determine whether employees are similarly situated under the FLSA, District Courts within the Ninth Circuit generally follow a two-step approach. *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1109-1110 (9th Cir. 2018) (citations omitted); *Colson v. Avnet, Inc*., 687 F. Supp. 2d 914, 925 (D. Ariz. 2010). At the first step, courts conditionally certify a collective action if the plaintiff presents "substantial allegations that the putative class members were together the victims of a single decision, policy, or plan." *Colson*, 687 F.3d at 925 (citations omitted). If the plaintiff meets this low burden, the potential members of the collective action are notified and presented the opportunity to opt-into the lawsuit. *Id*. At the second step, which takes place after notification and discovery, the defendant may move to decertify the class, and the Court revisits whether the class members are similarly situated. *Id*. The second step requires the Court to take a more exacting look at the Plaintiffs' allegations and the record. *Campbell*, 903 F.3d at 1109.

In *Campbell*, the Ninth Circuit clarified the standard for establishing whether class members are similarly situated for decertification after the close of discovery. *Id*. at 1117. The *Campbell* Court explicitly rejected the ad hoc approach used by the majority of courts

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
ESPLANADE CENTER III, SUITE 800
2415 EAST CAMELBACK ROAD
PHOENIX, AZ 85016
TELEPHONE: 602-778-3700

when deciding decertification, and instead held that collective treatment is appropriate only "to the extent party plaintiffs are alike in ways that matter to the disposition of their FLSA claims." *Id*. at 1114. What matters in a collective action "is not just any similarity between party plaintiffs, but a legal or factual similarity material to the resolution of the party plaintiffs' claims, in the sense of having the potential to advance these claims, collectively to some resolution." *Id*. at 1115 (emphasis in original). "A 'collective' action in which, as a material matter, no material dispute truly could be heard on a collective basis would hardly be consistent with the FLSA's remedial purpose." *Id*. at 1115-1116 (emphasis added). At the decertification stage, the Court may consider "the practical consideration of manageability or efficiency that permeated prior district court FLSA certification jurisprudence" to the extent those considerations show that the collective mechanism is infeasible. *Campanelli v. Image First Healthcare Laundry Specialists, Inc*., No. 15-CV-04456-PJH, 2018 WL 6727825, at *6 (N.D. Cal. Dec. 21, 2018) (citing *Campbell*, 903 F.3d at 1117).

On a post-discovery motion for decertification, the Court will apply a summary judgment standard. *Campbell*, 903 F.3d at 1118. The standard is:

> a mid- or post-trial analogue to the test applied at summary judgment, which asks, pretrial, whether sufficient evidence exists to preclude a judgment as a matter of law because, viewing the competent evidence in the light most favorable to the nonmoving party, the trier of fact could properly find for the nonmoving party.

*Id*. Viewing the evidence in the light most favorable to Plaintiffs here, collective treatment is infeasible and the collective should be decertified.[2]

## IV.   ANALYSIS

The Plaintiffs bear the burden, even at the decertification stage, of showing that collective treatment is appropriate. *Campbell*, 903 F.3d at 1117-18. Here, Plaintiffs cannot meet their burden because most, if not all, Plaintiffs performed job duties so different from

---

[2] For purposes of this motion only, Matrix assumes Plaintiffs' testimony and other evidence to be true.

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
ESPLANADE CENTER III, SUITE 800
2415 EAST CAMELBACK ROAD
PHOENIX, AZ 85016
TELEPHONE: 602-778-3700

one another as to require a highly individualized, fact intensive analysis regarding individual exemptions either on summary judgment or at trial. *Trinh v. JP Morgan Chase & Co.*, 2008 WL 1860161, at *4 (S.D.Cal. Apr. 22, 2008) ("When the ultimate issue of whether each employee was properly classified under the FLSA, the 'similarly situated' inquiry must be analyzed in terms of the nature of each . . . plaintiff's job duties").

To assess whether each Plaintiff's claims can be effectively resolved on a collective basis, the Court must first consider the specific factual and legal questions that a factfinder must answer to determine each Plaintiff's exempt status. *Marlo v. UPS, Inc.*, 639 F.3d 942, 948-49 (9th Cir. 2011) (affirming decertification of misclassification claims and stating that courts should consider nature of proof necessary to establish claims); *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 945-46 (9th Cir. 2009) (courts must consider a full range of factors that exemptions raise before deciding if claims can proceed on class basis). When determining whether employees are "similarly situated" in terms of job duties, courts will consider factors such as the job duties actually performed on a daily basis, the importance of the job duties performed, pay provisions, and whether any of the FLSA's exemptions might apply to members of the proposed collective. *Litty v. Merrill Lynch & Co.*, No. CV 14-0425 PA (PJWX), 2015 WL 4698475, at *7 (C.D. Cal. Apr. 27, 2015). "[T]he more dissimilar plaintiffs are and the more individuated [the employer's] defenses are, the greater doubts there are about the fairness of a ruling on the merits – for either side – that is reached on the basis of purportedly representative evidence." *Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 574 (E.D. La. 2008).

For example, in *Guanzon v. Vixxo Corp.*, the court decertified a collective action where the dispositive issue was whether the plaintiffs qualified for the administrative exemption. No. CV-17-01157-PHX-DWL, 2019 WL 1586873, at *5 (D. Ariz. Apr. 12, 2019). The court began its analysis by noting that the plaintiffs were similarly situated for the second element of the exemption (whether the employee's primary duty related to the management or general business operations of the employer or the employer's customers *see* 29 C.F.R. § 541.201(a)). *Id.* Despite being similarly situated as to some elements, the

6

court ultimately decertified noting that the dispositive issue was "whether [Plaintiffs are] similarly situated for purposes of the third element," discretion and independent judgment. *Id.* The court concluded they were not.

The decision in *Julian v. MetLife, Inc.*, No. 17-CV-957 (AJN), 2021 WL 3887763, at *11 (S.D.N.Y. Aug. 31, 2021) is particularly instructive and factually similar to this case. There, the Court held that the plaintiff Claims Specialists could not proceed as a class, denied their motion for class certification, and granted defendant MetLife's motion to decertify the collective action. *Julian*, 2021 WL 3887763, at *2-4. Just as with the claims examiners here, the *Julian* plaintiffs:

- administered disability claims in accordance with MetLife policies and procedures;

- elected how to utilize the variety of resources at their disposal, including clinicians;

- were responsible for gathering large amounts of information about the claims before them;

- identified and assessed red flags; and

- were ultimately responsible for investigating, assessing, and determining whether the claimant should receive benefits under the client plan.[3]

The *Julian* court held "[a] determination of exempt status requires an inquiry into the specifics of Plaintiff's job and similarly individualized inquiry into the specifics of each allegedly misclassified employee whom plaintiff is seeking to join," and found that "evidence regarding Metlife policies, procedures, and training cannot serve as common proof of lack of discretion or independent judgment." *Julian*, 2021 WL 3887763, at *4.

The same is true here. Any motion for summary judgment or trial will require a highly individualized fact intensive analysis into whether each Plaintiff exercised

---

[3] As is the case here, the MetLife supervisors were required to sign off on denials and approvals to grant benefits outside the amount of which the claims specialist was authorized to grant independently. *Julian*, 2021 WL 3887763, at *8. Moreover, MetLife had a quality assurance department that conducted regular audits. *Id.*

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
ESPLANADE CENTER III, SUITE 800
2415 EAST CAMELBACK ROAD
PHOENIX, AZ 85016
TELEPHONE: 602-778-3700

independent judgment and discretion with respect to matters of significance. While all of the Plaintiffs were properly categorized as exempt, the primary job duties involving the exercise of discretion varied from person to person. The named Plaintiffs and a number of Opt-In Plaintiffs were deposed in this case. Each Plaintiff was asked similar questions regarding his or her ability to exercise independent judgment and discretion and each Plaintiff's answers varied significantly, making collective treatment of this case truly infeasible. *See Campbell*, 903 F.3d at 1117 (a collective may be decertified where "conditions make the collective mechanism truly infeasible").

## V. **The Administrative Exemption**

To qualify for the FLSA's administrative exemption, an employee must (1) earn not less than $684 per week; (2) have the primary duty of performing office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (3) have the primary duty that includes the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200. The parties do not dispute that all Plaintiffs met the salary requirement for the administrative exemption. Ronfeldt Dec. at ¶ 7.

To meet the second requirement, "an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a). The regulations further state:

> An employee may qualify for the administrative exemption if the employee's primary duty is the performance of work directly related to the management or general business operations of the employer's customers. Thus, for example, employees *acting as advisers or consultants* to their employer's clients or customers . . . may be exempt.

29 C.F.R. § 541.201(c) (emphasis added). The line between exempt administrative employees and nonexempt employees may be drawn by distinguishing between those who are engaged in the "running of the business and not merely . . . the day-to-day carrying out of its affairs." *Bratt v. Cty. of Los Angeles*, 912 F.2d 1066, 1070 (9th Cir. 1990).

8

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
ESPLANADE CENTER III, SUITE 800
2415 EAST CAMELBACK ROAD
PHOENIX, AZ 85016
TELEPHONE: 602-778-3700

Plaintiffs' testimony confirmed that their primary duties involved performing office work directly related to the management or general business operations of Matrix's customers. They were primarily responsible for performing human resources functions for their client. [*See* Exhibit 2, Deposition of Cassandra Magdaleno taken July 22, 2021 at 76:18-21] (Q: So, generally, you understand that HR - - you're basically doing the HR work for Dignity Health, correct? A: For the leave portion, yes.); [*see* Exhibit 3, Deposition of Samantha Stocklein taken July 28, 2021 at 17:14-22] (interpreted and applied clients' leave policies) [*Id.* at 45:6-46:20] (contributed to an effective solution to a client problem); [*see* Exhibit 4, Deposition of Tina Weeks taken July 21, 2021 at 80:16-23] (interpreted and applied clients' leave policies). McDonald described himself as a "policy expert." [*Id.* at 53:17.4] As Plaintiffs alleged in their original Complaint, Plaintiffs' "primary job duty consisted of reviewing employee disability and leave of absence claims against predetermined guidelines to determine eligibility to determine benefit eligibility." (ECF No. 1 ⁋ 10). In other words, Plaintiffs performed a core human resources function for Matrix's clients. *See* 29 C.F.R. § 541.201(b) (listing human resources word directly related to the management or general business operations); 29 C.F.R. § 541.201(d) (listing "human resources managers who formulate, ***interpret or implement*** employment policies" as an example of administrative employees whose work is directly related to the management or general business operations of the employer or the employer's customers (emphasis added)). Indeed, the Seventh Circuit reached a similar conclusion regarding insurance claims adjusters. *See Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865, 872 (7th Cir. 2008) ("[I]nsurance claims adjusters generally meet the duties requirements for the administrative exemption, whether they work for an insurance company or other type of company." (quoting 29 C.F.R. § 541.203(a) (2006), amended and recodified at 541.203)).[5] Therefore,

---

[4] *See Boaz v. Fed. Exp. Corp.*, 107 F. Supp. 3d 861, 894 (W.D. Tenn. 2015), *aff'd sub nom. Boaz v. FedEx Customer Info. Servs., Inc.*, 668 F. App'x 152 (6th Cir. 2016) (employee who acted as subject-matter expert on projects was properly classified as exempt under the administrative exemption).

[5] *See Julian*, 2021 WL 3887763, at *10 ("There is no genuine dispute of material fact in the record that Plaintiff McKinney and all other Claim Specialists' "primary duty" is

9

like the Guanzon case, "[t]he disputed issue is whether [Plaintiffs are] similarly situated for purposes of the third element." *Guanzon*, 2019 WL 1586873, at *5.

## VI.    Discretion and Independent Judgment.

"The phrase 'discretion and independent judgment' must be applied in the light of all the facts involved in the particular employment situation in which the question arises." 29 C.F.R. § 541.202(b). Factors that are considered when determining whether an employee exercised discretion and independent judgment include, but are not limited to: (1) whether the employee performs work that affects business operations to a substantial degree, even if the assignments are related to the operation of a particular segment of the business, (2) whether the employee has the authority to commit the employer in matters that have significant financial impact, (3) whether the employee has authority to waive or deviate from established policies and procedures without prior approval, (4) whether the employee provides consultation or expert advise to management, (5) whether the employee investigates and resolves matters of significance, (6) whether the employee represents the company in handling complaints, disputes, or grievances. *Id.* The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment. *Id* at § 541.202(c).

Additionally, the Federal Regulations provide guidance on when an insurance claims adjuster position requires the exercise of discretion and independent judgment. *See* 29 C.F.R. § 541.203(a). Insurance claims adjusters "generally meet the duties requirements for the administrative exemption, whether they work for an insurance company or other type of company, if their duties include activities such as interviewing insureds, witnesses and physicians; inspecting property damage; reviewing factual information to prepare damage estimates; evaluating and making recommendations regarding coverage of claims; determining liability and total value of a claim; negotiating settlements; and making

handling LTD benefits claims and that this duty is "directly related to the management of general business operations" of MetLife or its customers.")

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
ESPLANADE CENTER III, SUITE 800
2415 EAST CAMELBACK ROAD
PHOENIX, AZ 85016
TELEPHONE: 602-778-3700

recommendations regarding litigation." *Id.* A claims adjuster does not need to perform all of the above duties to be exempt. Instead, a claims adjuster is exempt if the perform many of these duties. *Julian*, 2021 WL 3887763, at *11.

Here, Plaintiffs' job duties required them to review information provided by claimant, compare it to the clients' policies and guidelines, and make decisions on whether to approve or deny the claim. Between initial receipt of the claim and the ultimate determination, Plaintiffs exercised discretion and independent judgment on numerous issues including, whether to seek additional information from claimants, whether to seek additional information from witnesses, whether and how to seek clarification from treating physicians, whether and how to seek guidance from in-house nurse experts, whether to investigate fraud with third-party investigators, whether to investigate claimants' social media accounts, and how to calculate prior earnings for benefit determinations. As explained elsewhere in this brief, Plaintiffs' testimony regarding these claims processing decisions varied significantly.

Thus, the critical question here is whether Plaintiffs' primary duties included the exercise of discretion and independent judgment with respect to matters of significance in regards to: (1) making decisions regarding coverage; (2) assessing opinion of physicians and nurses, (3) the use of guidelines, (4) interviewing claimants and witnesses; (5) reviewing factual information to quantify a claim; and (6) making decisions that may impact future litigation. Ten of the 172 Plaintiffs were deposed, and their testimonies differed significantly on fundamental job responsibilities and the discretion involved in performing them. Given these differences, individualized inquiries are necessary to determine whether each Plaintiff was properly classified as exempt, and collective treatment is infeasible.

### a. Making Decisions Regarding Approval or Denial of Claims

A central issue is whether Plaintiffs had the discretion and authority to make final determinations to approve or deny a claim. While "employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher

level," 29 C.F.R. § 541.202(c),[6] the determination will depend on factors such as the how much weight their recommendation is given by their manager. *Green v. Harbor Freight Tools USA, I*nc., 888 F. Supp. 2d 1088, 1102 (D. Kan. 2012) (decertifying and observing "The variations in testimony centered on the weight given a particular Store Manager's hiring recommendations, ranging from Plaintiffs who were free to chose from applicants that Human Resources approved for hire after the background check, to Plaintiffs who hired whomever corporate told them to hire.").

On the issue of discretion to approve or deny claims, the testimony of Plaintiffs varied wildly. Some testified that it was their responsibility alone to make this decision in most circumstances, and some even admitted that there were responsible for approving the decisions of other claims examiners. Another group of employees claimed that they had no input into the decision to approve or deny a claim. A third group testified that they would make recommendations to their supervisors as to whether to approve or deny a claim, but even within this group, there were significant differences as to how much weight was given to their recommendations, which as explained below is an important factor in evaluating discretion and independent judgment.

The responsibility for final approval of claims strongly supports a finding of independent judgment and discretion, and some Plaintiffs testified that they had this responsibility. Lawrence Smith testified that his supervisor did not review his claims determinations. [*See* Exhibit 5, Deposition of Lawrence Smith taken March 9, 2022 at 54:8-12.] According to Mr. Smith, this was because of his seniority and the fact that he handled FMLA claims (unlike AMS and LTD claims examiners who handle insurance claims). [*Id.* at 54:13-55.] Samantha Stocklein testified that she made about 75% of her claims decisions

---

[6] "Even though an employee's work is subject to approval, even to the extent that a decision may be reversed by higher level management, it does not follow that the work did not require the exercise of discretion and independent judgment as the terms are defined for the administrative employee exemption." *Dymond v. U.S. Postal Serv.*, 670 F.2d 93, 96 (8th Cir. 1982). *Dannenbring v. Wynn Las Vegas, LLC*, 646 F. App'x 556, 557 (9th Cir. 2016) ("The Wynn did impose guidelines on these tasks, but the term 'discretion and independent judgment' does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review.").

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
ESPLANADE CENTER III, SUITE 800
2415 EAST CAMELBACK ROAD
PHOENIX, AZ 85016
TELEPHONE: 602-778-3700

1   without supervisor input. [Exh. 3, Stocklein Depo. at 64:14-20.] She would also interpret
2   and apply her clients' policies. [*Id.* at 17:14-22.] Cassanda Magdaleno testified that in the
3   vast majority of cases she was the one who would approve and deny claims. [Exh. 2,
4   Magdaleno Dep. at 55:7-10.] According to Mr. Smith, anytime a supervisor had too much
5   work to complete, a senior claims examiner was given the authority to review and approve
6   a determination by other claims examiners. [Exh. 5, Lawrence Smith Depo at 25:3-11.]

7       In contrast, when asked whether claims examiners made the decision to approve or
8   deny claims, Latrisha Smith responded: "No, we did not make the decision. . . . we would
9   share the information on the file with the manager, who would then respond to let us know
10  if it would be denied or not." [*See* Exhibit 6, Deposition of Latrisha Smith taken March 29,
11  2022 at 30:2-8.] Ms. Smith testified that she would not even make a recommendation to
12  her manager as to whether to deny the claim. [*Id.* at 54:1-14.] According to Michael
13  McDonald, claims examiners provided no input into the approval or denial of mental health
14  claims, and he would simply provide whatever the nurse said to his supervisor. [*See* Exhibit
15  7, Deposition of Michael McDonald taken July 23, 2021 at 60:4-25.]

16      Another set of Plaintiffs testified that they made recommendations as to claims
17  decisions but that the final decision was made by the in-house nurse or their manager. For
18  some of this subset, Plaintiffs claim that their supervisors gave significant weight to their
19  recommendations and usually followed them. Amanda Wright testified that if, in her
20  opinion, the medical information supported approval of a claim outside of the guidelines,
21  her supervisor would generally agree with her. [*See* Exhibit 8, Deposition of Amanda
22  Wright taken December 30, 2021 at 77:16-78:10.] Jasmine Sims testified that her
23  supervisor would disagree with her recommendations 5 to 10 percent of the time. [*See*
24  Exhibit 9, Deposition of Jasmine Sims taken December 21, 2021 at 52:13-16.] Mary Floyd
25  could not think of a single instance where her supervisor disagreed with her
26  recommendation to approve or deny a claim[*See* Exhibit 10, Deposition of Mary Floyd
27  taken December 16, 2021at 47:17-48:7], and in the three years Matrix employed Ms.
28

13

Weeks, her supervisor only disagreed with her decision when a file was missing some medical information.[Exh. 4, Weeks Depo. at 43:1-15.]

Other claims examiners had their recommendations scrutinized more closely. When she was a supervisor, Ms. Sims did not accept the recommendations of some claims examiners only 5% of the time, while for others, she rejected around 30% of the their recommendations. [Exh. 9, Sims Depo. at 53:3-12.] Mr. Smith testified that whether a claims examiner recommendation was followed depended in part on their level of experience, and that when he was a supervisor, he was more likely to reject the recommendation of a Level I than of a Senior. [Exh. 5, Lawrence Smith Depo. at 28:2-11.]

All Plaintiffs exercised some discretion and independent judgment when it came to making ultimate determinations regarding a claim. However, the type and degree of discretion and independent judgment each Plaintiff was afforded varied wildly. Thus, the decision, by the court or jury, as to whether the Plaintiffs were properly categorized as exempt administrative employees will turn on the day-to-day activities and authority vested in each individual Plaintiff. Because the dispositive issue in this case will require a highly individualized fact intensive analysis, collective status is not appropriate. *See Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp. 2d 216, 220 (D. Conn. 2003) (declining to allow a FLSA collective action to proceed for insurance claim adjusters because the "merits of [their] claim will turn upon evidence relating to [their] day-to-day tasks, and not upon any [ ] company policy or decision.")

**b. Use of In-house Nurses**

The reliance on the opinions of experts, such as physicians and nurses, does not eliminate the need for discretion and judgment. *In re Farmers Ins. Exch., Claims Representatives' Overtime Pay Litig.*, 481 F.3d 1119, 1130 (9th Cir. 2007). In *Farmers Ins.*, the Court opined that the decision on when to use computer software to aide in valuing a claim and what weight to give the software's recommendation was akin to deciding when to use the "best tool" for a job. *Id.*; *see also Julian*, 2021 WL 3887763, at *12-13 (the use of nurses as a resource do not defeat the exemption). Plaintiffs' argument in summary

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
ESPLANADE CENTER III, SUITE 800
2415 EAST CAMELBACK ROAD
PHOENIX, AZ 85016
TELEPHONE: 602-778-3700

judgment and trial would likely be that Plaintiffs were not making the claims decisions themselves, but rather were relying on the clinical expertise of the in-house nurses. However, the extent to which Plaintiffs utilized the nurses and arguably outsourced the claim decision varied significantly. Some Plaintiffs rarely used nurses or admitted that they did not have to follow the input of the nurses. Other Plaintiffs testified that they utilized the nurses routinely and had no authority to disregard their opinions. Additionally, the Plaintiffs' testimony also varied in terms of whether they had discretion to seek input from nurses in the first place.

Cassandra Magdaleno testified that she did not have the authority to send a case to a nurse and instead the decision to seek nurse involvement was made exclusively by her manager. [Exh. 2, Magdaleno Depo. at 39:4.] Mary Floyd testified that in some cases she could not extend benefits beyond a certain date unless the nurse agreed. [Exh. 10, Floyd Depo. at 47:10-13.] In fact, according to Plaintiff Floyd, Matrix nurse case managers were the ones that approved claims. [*Id.* at 49:11-17.] Michael McDonald testified that he sent 98 percent of his claims to nurses for review. [Exh. 7, McDonald Depo. at 40:14-15.]

On the other end of the spectrum, Lawrence Smith testified that the nurses were only there to provide guidance to the claims examiner as well as support for their decisions. [Exh. 5, Lawrence Smith Depo. at 22:17-23:7.] He also testified that it was up to him to decide when to seek a nurse review, and the frequency of nurse review depended on the types of claims an examiner handled. [*Id.* at 30:8-10; 30:19-24.] According to Mr. Smith, with AMS claims, "every claim is different," "what's for one claim is not going to be the same thing for the next claim, and "every claim is reviewed individually" to determine if nurse review is merited. [*Id.* at 38:19-39:20.] Likewise, Samantha Stocklein testified that a claims examiner had discretion to seek input from a nurse if they were uncertain about something. [Exh. 3, Stocklein Depo. at 24:16-24.] Ms. Stocklein also testified that if she disagreed with a nurse she could go to her supervisor with her disagreement and request the supervisor overrule the nurse. [*Id.* at 27:12-18.] Further, Ms. Stocklein also had discretion as to when to seek a nurse review as to some of her claims. [*Id.* at 29:23-30:1;

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
ESPLANADE CENTER III, SUITE 800
2415 EAST CAMELBACK ROAD
PHOENIX, AZ 85016
TELEPHONE: 602-778-3700

78:7-16.] Amanda Wright testified that she would only send cases to nurses where she "absolutely had to" [Exh. 8, Wright Depo. at 86:7-8], but less experienced examiners would rely more heavily on nurses. [*Id.* at 89:8-17.] Ms. Wright also testified that when a nurse review was taking too long she would go to her manager and make a decision on a claim without a nurse review. [*Id.* at 35:15-20.] Furthermore, Ms. Wright would, on her own initiative, seek additional medical information to convince the nurse and change the nurse's mind. [*Id.* at 37:5-21.] Tina Weeks testified that she would seek guidance from a nurse when she was considering a vocational review, but, ultimately, it was her decision whether to conduct a vocational review. [Exh. 4, Weeks Depo. at 53:21-54:5.] Ms. Weeks also would go to her supervisor if she disagreed with a nurse. [*Id.* at 109:3-9.]

Other Plaintiffs' testimony put them somewhere in between. Lori Cable testified that 25% of her claims had to be reviewed by a nurse, but that nurses only gave recommendations. [*See* Exhibit 11, Deposition of Lori Cable taken March 22, 2022 at 28:3-10; 33:12-15.] Jasmine Sims testified that some clients required a nurse review for every disability claim. [Exh. 9, Sims Depo. at 41:13-16.] However, some of Ms. Sims' clients and claims types left the decision to seek a nurse review up to examiner's discretion. [*Id.* at 57:10-14.] When Ms. Sims disagreed with a nurse's assessment she would provide a recommendation to her supervisor to disagree with the nurse. [*Id.* at 60:3-12.] Latrisha Smith testified that she did not have the authority to overrule a nurse, but could request that her manager override the nurse. [Exh. 6, Latrisha Smith Depo. at 35:15-36:2.] Ms. Smith further testified that she would make the decision about whether to escalate a case to her supervisor or a nurse case manager on a case-by-case basis. [*Id.* at 60:23-61:9.]

As set forth above, each individual Plaintiffs' testimony significantly varied as to whether they had to get input from a nurse, if they had discretion to seek a nurse review, the degree to which a nurse's decision was final, and their ability to overrule or request their supervisor disregard a nurse's decision.

Each Plaintiff's decision to use, reliance on, and interactions with experts such as nurses, is relevant to the determination of whether they meet the administrative exemption.

16

Moreover, the discretion they exercise when interacting with these experts is an important factor when deciding whether a Plaintiff exercised independent judgment. Since the degree of discretion and independent judgment each Plaintiff exercised in regards to reliance on experts varied from Plaintiff to Plaintiff, collective treatment is not appropriate.

### c.  Use of Guidelines

Another tool that claims examiner had available to them were guidelines and checklists. Discretion circumscribed by operating policies and procedures does not eliminate the day-to-day discretion that an employee exercises. *See Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 507 (6th Cir. 2007) ("Even though Thomas's discretion was somewhat circumscribed by her district manager's supervision and Speedway's standardized operating procedures, she daily exercised discretion over matters vital to the success of her station."). While some Plaintiffs admitted that the guidelines and checklists did not dictate the outcome of the claims decisions, other Plaintiffs described their decisions to be completely dependent on these tools. Thus, whether a Plaintiff's use of guidelines and checklists cuts against a finding of independent judgment and discretion depends on the Plaintiff.

On one end of the spectrum, Tina Weeks testified that the process was pretty standardized and she was basically following the guidelines. [Exh. 4, Weeks Depo. at 124:17-25.] Amanda Wright was asked if she was bound by the guidelines and responded "Kind of, yeah" but also admitted that there was significant variation by region of the country. [Exh. 8, Wright Depo. at 68:2-69:8.] Cassandara Magdaleno testified that for one client it was a standard operating procedure just to use the guidelines. [Exh. 2, Magdaleno Depo. at 31:20-32:5.] She testified that she always followed the guidelines. [*Id.* at 41:12-42:4.] Lori Cable testified that she had no authority unless a claim hit the specific guidelines. [Exh.11, Cable Depo. at 41:16-19.]

On the other end of the spectrum, Samantha Stocklein testified that she exercised discretion and approved claims beyond what was recommended by the Official Disability Guidelines. [Exh. 3, Stockelin Depo. at 24:16-26:14.] Lawrence Smith testified that as

17

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
ESPLANADE CENTER III, SUITE 800
2415 EAST CAMELBACK ROAD
PHOENIX, AZ 85016
TELEPHONE: 602-778-3700

many as 80 percent of his claims fell outside of the Official Disability Guidelines. [Exh. 5, Lawrence Smith Depo. at 38:7-11.] Mr. Smith further testified that he had to exercise discretion on a claim-by-claim basis to determine how to handle a claim that fell outside of the guidelines. [*Id.* at 38:18-39:15.] Similarly, Jasmine Sims testified that she could still recommend approval of claims even if they fell outside of the Official Disability Guidelines. [Exh. 9, Sims Depo. at 59:4-21.]

Whether a claims examiner was bound to a strict set of guidelines or only used the guidelines as reference points from which they could deviate is a key factor to consider when determining whether the administrative exemption applies. *See Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865, 875 (7th Cir. 2008) (adjusting manual and estimating software are most accurately characterized as tools that channel rather than eliminate discretion where employees had the leeway to deviate from them). As explained above, the application of this factor will vary from Plaintiff to Plaintiff. Therefore, collective treatment is inappropriate.

### d. Interviewing

In *Julian*, the court found that claims adjusters met the administrative exemption. 2021 WL 3887763, at *11. One of the factors the court relied on was the Plaintiff's ability to interview the insured. *Id.* The court found that this factor supported a finding of discretion and independent judgment despite the fact that "Claim Specialists have an interview guideline that they follow but are able to ask follow-up questions on the spot based on the claimant's answers." *Id.* at * 8.

Here, the Plaintiff's testimony regarding interviews varied from Plaintiff to Plaintiff. Plaintiff Wright testified that she would speak to claimants' doctors, spouses, children, and other close relatives. [Exh. 8, Wright Depo. at 111-112.] Indeed, Ms. Wright testified that there was no formal policy regarding who she could interview other than to get authorization and memorialize your conversations. [*Id.* at 112:14-18.] Plaintiff Weeks testified that she would call claimants for the annual reviews and ask questions regarding their daily activities. [Exh. 4, Weeks Depo. at 104:15-105:2.] Ms. Weeks also testified that

1   she would make judgment calls regarding a claimant's veracity and take additional steps

2   to verify their claim. [*Id.* at 49:9-24.]

3        Latisha Smith testified that her interviews were limited to understanding how they

4   were injured and the scope of their injury. [Exh. 6, Latisha Smith Depo. at 10:11-20.]

5   Jasmine Sims testified that she would only interview witnesses "occasionally." [Exh. 6,

6   Sims Depo. at 108 at 17-21.] Cassandra Magdaleno testified that she would ask claimants

7   a series of questions from a template. [Exh. 2, Magdaleno Depo. at 48:12-19.] Lori Cable

8   testified that she would make her decisions based solely on the physician provided medical

9   certification. [Exh. 11, Cable Depo. at 87:25-88:6.] However, Ms. Cable would contact

10  someone within the HR department at her clients if she had questions. [*Id.* at 107:5-23.]

11  Mary Floyd testified that when she interviewed claimants, there were "definite questions"

12  that she would use. [Exh. 10, Floyd Depo. at 98:9-14.]

13       The regulations are clear that a "claims adjuster's" ability to conduct interviews with

14  claimants and witnesses is relevant to the determination of whether they meet the

15  administrative exemption. Moreover, the discretion they exercise when conducting those

16  interviews is an important factor when deciding whether a Plaintiff exercised independent

17  judgment. As outlined above, the degree of discretion and independent judgment each

18  Plaintiff exercised in regards to interviewing claimants and witnesses varied from Plaintiff

19  to Plaintiff. Therefore, collective treatment is not appropriate.

20       **e. Quantifying claims**

21       In the context of insurance claims adjusters, one factor relevant to the analysis is the

22  adjuster's ability to determine potential liability and total value of a claim. 29 C.F.R.

23  § 541.203(a). While Plaintiffs were not required to determine the total value of a claim,

24  they were required to determine the amount of benefits owed. In doing so, the Plaintiffs

25  had to exercise discretion and independent judgment. However, the amount of discretion

26  and independent judgment varied by Plaintiff.

27       Mary Floyd testified that, while she calculated pre-disability earnings to determine

28  benefits, her supervisor would have to approve her conclusions. [Exh. 10, Floyd Depo at

19

47:1-9.] However, according to Floyd, calculating earnings was not simple math, instead, "[t]here could be all kinds of things, how much commissions were used, how much they varied, if you – whatever you were including or not including" [*Id.* at 103:22-105:7.] Jasmine Sims testified that claims handler discretion in regards to calculating benefits varied from client to client. [Exh. 9, Sims Depo. at 33:24-35:3.] Latrisha Smith testified that new claims examiners had $0 in approval authorization, but as they learn the process and show they know when they need to escalate their approval amount increased. [Exh. 6, Latrisha Smith Depo. at 63:6-12.] Lawrence Smith testified that as a Senior claims examiner he would review determinations by junior claims examiners including ensuring proper calculation of benefits. [Exh. 5, Lawrence Smith Depo. at 25:3-22.] Samantha Stocklein has $5,000 in bi-weekly benefit authority and would approve benefits calculations for other claims examiners. [Exh. 3, Stocklein Depo. at 69:3-6.]

An additional layer of complexity is added to the analysis depending on the type of claims examiner the fact finder is considering. The above listed examiners all managed short term and long-term disability claims, which require the calculation of a benefit amount. However, claims examiners who exclusively handled FMLA and other unpaid leaves of absences did not. For example, Cassandra Magdaleno and Michael McDonald testified that they did not have to calculate earnings because they only handled FMLA leave. [Exh. 2, Magdaleno Depo. at 71:25-72:7; Exh. 7, McDonald Depo. at 45:22-24.]

Also significant to the evaluation of discretion and independent judgment is the amount of authority. *See McLaughlin v. Nationwide Mut.l Ins. Co.*, Civil No. 02-6205-TC, 2004 WL 1857112 at *13 (D. Or. Aug. 18, 2004) (citing positively to a DOL opinion letter concluding insurance claims adjusters performed administrative work where they had complete discretion and independent judgment as to claims within their established authority even though that authority was as low as $3,000 for some adjusters). Jasmine Sims had the authority to approve short-term disability claims up to $1,000 and could approve FMLA claims without supervisor approval. [Exh. 9, Sims Depo. at 83:20-84:1.] As Lawrence Smith testified, claims examiners had different levels of approval authority

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
ESPLANADE CENTER III, SUITE 800
2415 EAST CAMELBACK ROAD
PHOENIX, AZ 85016
TELEPHONE: 602-778-3700

depending on the number of errors in their work. [Exh. 5, Lawrence Smith Depo. at 29:19-21.]

The amount of discretion and independent judgment vested in each individual Plaintiff to quantify a claim is a key factor the court or jury must consider when determining whether the Plaintiffs were properly categorized as exempt administrative employees. Because the amount of discretion and authority to exercise independent judgment varied from Plaintiff to Plaintiff, collective status is inappropriate.

### f.  Denial Letters

While Plaintiffs in this case did not make decisions regarding litigation, some (but not all) of them exercised independent judgment regarding matters that could have a significant impact on future litigation against Matrix's clients. Particularly, the language contained in denial letters is frequently a key issue in subsequent litigation. *See, e.g., Harlick v. Blue Shield of California*, 686 F.3d 699, 719 (9th Cir. 2012) ("A plan administrator may not fail to give a reason for a benefits denial during the administrative process and then raise that reason for the first time when the denial is challenged in federal court, unless the plan beneficiary has waived any objection to the reason being advanced for the first time during the judicial proceeding."); *Lang v. Long-Term Disability Plan*, 125 F.3d 794, 799 (9th Cir. 1997) ("We conclude that the inconsistencies in the reasons Standard gave for its refusals to lift the "mental disorder" limitation constitute material, probative evidence that its decision was affected by self-interest."). Based on Plaintiffs' testimony, the amount of discretion and independent judgment each Plaintiff had regarding denial letters varied significantly.

Some claims examiners exercised a significant amount of independent judgment and discretion when preparing detailed denial letters. For example, Mary Floyd testified that she was responsible for drafting denial letters and made the initial determination of what particulars to include. [Exh. 10, Floyd Depo. at 81:7-13.] Ms. Floyd agreed that a denial letter could make or break an appeal and has seen examples of poorly written denial letters having a negative impact on appeals. [*Id.* at 83:5-17.] Likewise, Jasmine Sims

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
ESPLANADE CENTER III, SUITE 800
2415 EAST CAMELBACK ROAD
PHOENIX, AZ 85016
TELEPHONE: 602-778-3700

testified that as a claims examiner she was responsible for writing denial letters, which varied in complexity depending on the type of claim and reason for denial. [Exh. 9, Sims Depo. at 71:3-73:2.] Ms. Sims also stated that, based on the situation, she would make a decision regarding whether a denial letter would be detailed or cursory. [*Id.* at 72:12-14.] Samanta Stocklein helped modify a form denial letter to fit new ERISA guidelines. [Exh. 3, Stocklein Depo. at 32:22-33:7.] Tina Weeks described the denial letter process as "very long" because she "had to put medical information in regard to in the letter explain why, you know, is the impairment at a severity that it would preclude or is it a diagnosis that is manageable and you're still able to work." [Exh. 4, Weeks Depo. at 42:13-17.]

On the other end of the spectrum, Cassandra Magdaleno testified that her denial letters were automatically generated by the system. [Exh. 2, Magdaleno Depo. at 34:2-15.] Michael McDonald testified that he would use a form letter that included a synopsis that he prepared and his supervisor approved. [Exh. 7, McDonald Depo. at 125:12-126:3.] Amanda Wright testified that she did not write denial letters as they were programed into the system as templates. [Exh. 8, Wright Depo. at 94:9-14.]

The amount of discretion and independent judgment vested in each individual Plaintiff when crafting denial letters is a key factor the court or jury must consider when determining whether the Plaintiffs were properly categorized as exempt administrative employees. Because the amount of discretion and authority to exercise independent judgment varied from Plaintiff to Plaintiff, collective status is inappropriate.

### g.  Other examples of discretion and independent judgment.

The phrase "discretion and independent judgment" must be applied in the light of all the facts involved in the particular employment situation in which the question arises. 29 C.F.R. § 541.202(b). To that end, there are several other unique job duties, characteristics or circumstances that will impact the application to the administrative exemption as to some Plaintiffs but not others.

One example is mentoring or training other claims examiners. *Guanzon*, 2019 WL 1586873, at \*7 (citing variance in mentoring or training co-workers as one of the reasons

22

collective treatment was inappropriate). Lawrence Smith testified that some senior AMS examiners would train new hires, send out daily task lists, and review determinations by lower level examiners. [Exh. 5, Lawrence Smith Depo. at 28:12-25.] Plaintiffs Lori Cable [Exh. 11, at 40:15-19], Jasmine Sims [Exh. 9, at 30:15-20], and Latrisha Smith [Exh. 6, at 52:1-3] served as mentors, but Plaintiffs Mary Floyd [Exh. 10, at 32:17-23], Cassandra Magdaleno [Exh. 2, at 84:21-25], Samantha Stocklein [Exh. 3, at 36:16-19], and Amanda Wright [Exh. 8, at 79:6-10] did not.

Looking for discrepancies or "red flags" involves the exercise of discretion and independent judgment. Some claims examiners testified that this was one of their job duties, while others said it was not. Mary Floyd would check Facebook if she suspected a claim was fraudulent. [Exh. 10, Floyd Depo. at 66:22-68:8.] However, Amanda Wright said that she was not allowed to check claimants' social media accounts. [Exh. 8, Wright Depo. at 48:6-12.] Tina Weeks testified that she could order outside surveillance of a claimant [Exh. 4, Weeks Depo. at 50:18-51:3]; and Mary Floyd could recommend hiring third-party surveillance for a claimant. [Exh. 10, Floyd Depo. at 68:14-18.] Lawrence Smith had to use judgment regarding when to notify a supervisor about potential fraud. [Exh. 5, Lawrence Smith Depo. at 44:10-20.] *See Foster v. Nationwide Mut.Ins.Co.*, 710 F.3d 640, 649 (6th Cir. 2013) (conducting investigations with the purpose of resolving the indicators of fraud and the legitimacy of suspicious claims involves the exercise of independent judgment and discretion). On the other hand, Latisha Smith said that it "wasn't [their] role to determine or look for red flags if it was fraudulent." [Exh. 6, Latisha Smith Depo. 47:1-9.]

The facts and testimony underlying the factors relevant to the determination of whether the Plaintiffs were misclassified varied significantly. This is not surprising. Because the nature of the claims Matrix handles vary significantly, the handling of those claims also varies. Plaintiff avers that all claims examiners are interchangeable in terms of their day-to-day job duties. The record does not support this contention.

At bottom, the day-to-day job duties of any single claims examiner is likely to vary significantly from the claims examiner down the hall. As outlined above, these differences arise from a variety of factors such as the types of claims they handle, the needs of their clients, their experience, and their supervisor. These differences manifest in a variety of ways resulting in varying levels of authority to exercise independent judgment and discretion. This renders the application of the administrative exemption in a collective manner impossible.

**VII.    Conclusion**

Plaintiffs' testimony establishes that the collective mechanism is infeasible here. While all claims examiners were properly classified as exempt, making this determination requires an examination into each Claims Examiner's individual job duties. Based on Plaintiffs' own testimony, there is a wide spectrum of job duties to be considered to determine whether Plaintiffs were properly classified. For example, at one end, some Plaintiffs testified they did very little interviewing of claimants and witnesses, considered nurses' recommendations as dispositive, did not make any final decisions on claims, had little or no monetary authority, had no discretion in when crafting denial letters, did not train or mentor others, or could not do anything when it came to investigating potential fraud.  On the other end of the spectrum, some Plaintiffs conducted extensive interviews with claimants, witnesses, and treating physicians, gave little to no weight to nurse opinions or only sought them when absolutely necessary, had unlimited discretion to approve and deny claims, had significant monetary authority, crafted individual denial letters to claimants, trained and mentored other claims examiners, flagged cases as potentially fraudulent, ordered third-party surveillance or vocational specialists, or searched through claimants social media accounts for evidence of fraud.

Furthermore, it does not appear that any sub-category of claimants (such as Level I LOA claims administrators) can be analyzed together. Indeed, for most Plaintiffs, some of the above factors weigh heavily in favor of the administrative exemption applying while others do not. Ultimately, the determination as to whether any given Plaintiff was properly

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
ESPLANADE CENTER III, SUITE 800
2415 EAST CAMELBACK ROAD
PHOENIX, AZ 85016
TELEPHONE: 602-778-3700

categorized as exempt will depend on how the fact-finder weighs each Plaintiffs' testimony about each factor in light of their testimony about the other factors. Because resolution of Plaintiffs' claims will require the Court or the jury to analyze and weigh each Plaintiff's testimony about the various aspects of their individual job duties to determine whether he or she was properly classified as exempt, the collective mechanism is infeasible, and Defendant respectfully requests that the collective be decertified.

RESPECTFULLY SUBMITTED this 30th day of June 2022.

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.

By:   /s/ Tracy A. Miller
      Tracy A. Miller
      Douglas (Trey) Lynn
      2415 East Camelback Road, Suite 800
      Phoenix, AZ 85016

      *Attorneys for Defendant Matrix Absence
      Management Inc.*

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
Esplanade Center III, Suite 800
2415 East Camelback Road
Phoenix, AZ 85016
Telephone: 602-778-3700

51860044.v1-Ogletree
52030380.v1-OGLETREE